# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| TANYA FRISCH and LISA SHELANGOSKI,<br><br>        Plaintiffs,<br><br>vs.<br><br>SHANGHAI HUAYI GROUP CORPORATION LIMITED, a Chinese corporation, and CHINA MANUFACTURERS ALLIANCE, LLC; A California limited liability company,<br><br>        Defendants. | No. 23-CV-15-CJW-KEM<br><br>ORDER |

The matter before the Court is plaintiffs' motion to remand. (Doc. 21). Defendants timely resisted. (Doc. 23). Plaintiffs timely replied. (Doc. 26). For the following reasons, the Court **grants** this motion.

## I.    BACKGROUND

### A.    The Accident

On August 14, 2018, a tire on a dump truck blew out, causing the dump truck to crash into plaintiffs' vehicle and severely injure both plaintiffs. (Doc. 21-1, at 3). The dump truck was owned by Liberty Drainage & Excavation ("Liberty Drainage"). (Doc. 21-3, at 1). The tire was designed and manufactured by Double Coin Holdings, Ltd., now known as Shanghai Huayi Group ("SHG"), and distributed by defendant China Manufacturers Alliance, LLC ("CMA"). (Doc. 21-2, at 1).

After communications between plaintiffs' counsel and counsel for Liberty Drainage, Liberty Drainage made the tire available for inspection. (Doc. 21-4, at 1).

1

On February 6, 2019, plaintiffs, Liberty Damage, SHG, Sadler Power Train, Inc. ("Sadler Power Train"), and Harry's Farm Tire, Inc. ("Harry's Farm Tire") attended the inspection of the tire. (Docs. 21-1, at 4; 21-6, at 1). On February 7, 2019, Liberty Drainage informed plaintiffs that Harry's Farm Tire installed the tire before the accident and that Sadler Power Train put the brakes on the truck in June before the accident. (Docs. 21-1, at 4; 21-4, at 1; 21-6, at 1).

Several months later, plaintiffs settled any potential claims with Liberty Damage. (Doc. 21-4, at 2). Plaintiffs then sued the remaining companies. (Doc. 5). In that petition, plaintiffs asserted that they were citizens of Iowa. (*Id.*, at 1). Defendant SHG is a citizen of China. (*Id.*). Defendant CMA is a citizen of California. (*Id.*, at 2). Plaintiffs also sued Harry's Farm Tire and Sadler Power Train (collectively "the Iowa defendants") (*Id.*, at 2) both of whom are Iowa citizens.

### B.    *Procedural History*

On May 1, 2020, plaintiffs sued defendants in state court under theories of negligence and strict liability. (Docs. 1-1, 1-8; 5, at 1). Between May 27, 2020, and July 30, 2020, the Iowa defendants and CMA filed their answers. (Doc. 21-4, at 2; 21-5; 21-6). Defendant CMA specifically pled that the Iowa defendants' negligence "was the real, active and primary cause of the alleged injuries complained of in the Petition. The superseding, initiating, and intervening negligence is pleaded in bar of recovery by the Plaintiffs." (Doc. 1-1, at 162) (asserting CMA's Fifteenth Defense).

On June 17, 2020, plaintiffs were required to serve defendant SHG under the Hague Service Convention. (Doc. 1-1, at 511). That day, plaintiffs moved, with defendants' approval, to extend the deadline for service under the Hague Service Convention. (*Id.*). On July 30, 2020, SHG filed its answer, asserting in part the Iowa defendants' negligence "was the real, active and primary cause of the alleged injuries complained of in the Petition. The superseding, initiating, and intervening negligence is

2

pleaded in bar of recovery by the Plaintiffs." (*Id.*, at 597) (asserting SHG's Sixteenth Defense).

By August 21, 2020, plaintiffs obtained initial disclosures from the Iowa defendants. (Docs. 21-1, at 14; 23, at 14). Harry's Farm Tire's initial disclosure and the attached invoice revealed that on October 13, 2014, it had sold the tire to Liberty Drainage—almost four years before the crash. (Docs. 21-1, at 14; 21-9, at 3; 21-11, at 1). Sadler Power Train's initial disclosure and the attached invoice revealed that in June 2018, Sadler Power Train was employed only to fix the brakes, not the tires. (Docs. 21-1, at 14; 21-8, at 2; 21-12, at 1).

On November 25, 2020, plaintiffs served defendant SHG through the Hague Service Convention procedures. (Doc. 21-4, at 2). On December 15, 2020, defendant SHG moved to dismiss the case for lack of personal jurisdiction. (*Id.*). The state court permitted jurisdictional discovery and argument on this issue to be completed by May 25, 2021. (*Id.*). Throughout the litigation, the parties filed joint motions to extend discovery deadlines, which the court granted. (Doc. 1-1, at 512, 517, 523, 561, 565, 633). These motions cited the delay in service and the litigation over personal jurisdiction. (*Id.*).

In January 2021, defendants served Liberty Drainage with a subpoena, and Liberty Drainage produced annual inspections and invoices for the subject tractor-trailer, including invoices from Harry's Farm Tire and Sadler Power Train that named the inspector in charge. (Doc. 21-1, at 6). Before May 25, 2021, plaintiffs learned defendant SHG sold the tire to K&M Tire in Iowa, who then sold that tire to Harry's Farm Tire. (Docs. 21-1, at 6, 14; 21-13, at 1) (Item No. 1133378258).

On October 26, 2021, months after the removal deadline, the parties deposed the truck driver and owner of Liberty Drainage. (Doc. 21-1, at 7; 21-14). Testimony revealed Liberty Drainage, not Sadler Power Train, employed the inspector who prepared

the annual inspection the year of the accident. (Docs. 21-1, at 7; 21-14, at 4). Testimony also confirmed Harry's Farm Tire sold the tire four years prior to the accident, rather than a year earlier. (Docs. 21-1, at 7; 21-14, at 6, 13).

On March 14, 2022, the state court denied defendant SHG's motion to dismiss for lack of personal jurisdiction. (Doc. 21-4, at 3; 1-1, at 512). On April 7, 2022, plaintiffs served written discovery on defendant SHG. (Doc. 21-4, at 3). On June 14, 2022, defendant SHG produced documents in Mandarin, which required translation. (*Id.*). On July 11, 2022, plaintiffs requested depositions of corporate representatives of defendants SHG and CMA, and between September 21 and 22, 2022, plaintiffs conducted those depositions. (*Id.*).

On November 21, 2022, plaintiffs served expert designations with reports that did not support Sadler Power Train and Harry Farm Tire's liability. (Doc. 21-1, at 8; 21-4, at 4). In response, on January 9, 2023, Sadler Power Train moved for summary judgment on the grounds of lack of expert testimony. (Doc. 1-1, at 749-58). On January 12, 2023, plaintiffs asked for an extension of time to respond to the motion so they could "see CMA/Double Coin's expert reports first." (Docs. 21-4, at 4; 21-15, at 1)[1]. On February 1, 2023, defendants SHG and CMA provided their expert disclosures. (Doc. 1-1, at 798). On February 13 and 20, 2023, after discussions with counsel for Sadler Power Train and Harry's Farm Tire, plaintiffs dismissed their claims against Sadler Power Train and Harry's Farm Tire without prejudice, four months before trial.[2] (Docs. 1-1, at 627, 805-10; 21-4, at 4).

---

[1] Plaintiffs also argue they wanted to test if additional discovery was needed. (Doc. 21-4, at 4).

[2] Trial was set for June 19, 2023. (*Id.*, at 562, 627).

On March 9, 2023, within 30 days of the dismissal of the Iowa defendants, defendants CMA and SHG removed this case to federal court, asserting diversity of citizenship now existed. (Docs. 1; at 1-3; 21-1, at 9). Plaintiffs then filed this motion to remand. (Doc. 21).

## II.     APPLICABLE LAW

Federal courts have subject matter jurisdiction only over matters authorized by the United States Constitution and Congress. U.S. CONST. art. III, § 2, cl.1; *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (stating that federal courts "possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree") (internal citations omitted). Federal courts should therefore "presume[ ] that a cause lies outside this limited jurisdiction[.]" *Kokkonen*, 511 U.S. at 377 (internal citations omitted); *Spreitzer Props., LLC v. Travelers Corp*, 599 F. Supp. 3d 774, 778–79 (N.D. Iowa 2022).

Congress codified diversity of citizenship jurisdiction in Title 18, United States Code, Section 1332. Under this statute, "diversity jurisdiction does not exist unless *each* defendant is a citizen of a different State from *each* plaintiff" and the amount in controversy exceeds $75,000. *Spreitzer Properties*, 599 F. Supp. 3d at 779 (quoting *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373 (1978) (emphasis in original)) (explaining the history and purpose of diversity jurisdiction); 18 U.S.C. § 1332.

"The proponents of federal jurisdiction bear 'the burden to establish federal subject matter jurisdiction,' and 'all doubts about federal jurisdiction must be resolved in favor of remand.'" *Moore v. Kansas City Pub. Schs.*, 828 F.3d 687, 691 (8th Cir. 2016) (quoting *Cent. Iowa Power Coop. v. Midwest Indep. Transmission Sys. Operator, Inc.*, 561 F.3d 904, 912 (8th Cir. 2009)). "This is true, even when the party opposing removal has moved to remand." *Druivenga v. Hillshire Brands Co.*, No. C 18-4003-MWB, 2018 WL 1115935, at *4 (N.D. Iowa Mar. 1, 2018).

## A.    Removal Procedure

Unless otherwise provided for by an act of Congress, defendants may remove "any civil action brought in a State court" to federal court if the federal district courts "have original jurisdiction" over that civil action.   28 U.S.C. § 1441(a).   The action may be removed to the federal district court and division "embracing the place where such action is pending."   *Id.*   The proponent of removal has the burden of establishing removal is proper.   *In re Bus. Men's Assurance Co. of Am.*, 992 F.2d 181, 183 (8th Cir. 1993) (per curiam).   "All doubts about federal jurisdiction should be resolved in favor of remand to state court."   *Sloss v. Tyson Fresh Meats*, No. 4:18-cv-00286-RGE-HCA, 2018 WL 9815609, at *2 (S.D. Iowa Dec. 17, 2018) (quoting *Block v. Toyota Motor Corp.*, 665 F.3d 944, 948 (8th Cir. 2011) (quoting *In re Prempro Prods. Liab. Litig.*, 591 F.3d 613, 620 (8th Cir. 2010))).

To do so, defendants must file "a notice of removal" in the appropriate United States district court.   28 U.S.C. § 1446(a).   Ordinarily, the notice of removal must be filed within the sooner of: (1) 30 days after the defendant receives, "through service or otherwise, . . . a copy of the initial pleading" that state the claim for relief, or (2) 30 days after the service of summons if the initial pleading is filed in court and "not required to be served on the defendant."   28 U.S.C. § 1446(b)(1).   "If the case stated by the initial pleading is not removable" but later becomes removable, defendants may file a notice of removal within 30 days after receiving "a copy of an amended pleading, motion, order or other paper" from which it may first be ascertained that the case "is or has become removable."   28 U.S.C. § 1446(b)(3).

Defendants, however, may not remove a case under this subsection on the basis of diversity-of-citizenship jurisdiction "more than 1 year after commencement of the action, unless the district court finds that the plaintiff has acted in bad faith in order to prevent a defendant from removing the action."   28 U.S.C. § 1446(c)(1).

## B.    The Definition of Bad Faith

The Eighth Circuit has not defined bad faith under Section 1446(c)(1).    Neither have courts in this district.    The Southern District of Iowa has adopted the definition that "[s]trategic conduct intended to deny the defendant the opportunity to remove the case to federal court demonstrates bad faith."    *Sloss*, 2018 WL 9815609, at *4 (collecting cases).    This includes "a strategy that effectively withholds information necessary to the removal decision until the limitations period has expired."    *Kum & Go, L.C. v. Veeder-Root Co.*, No. 4:13-cv-00446-JEG, 2014 WL 11514687, at *5 n.5 (S.D. Iowa Feb. 24, 2014) (noting "Congress amended 28 U.S.C. § 1446(c)(1) to ensure that Plaintiffs are unable to use 'removal-defeating strategies designed to keep the case in state court until after the 1-year deadline [has] passed.'"    *Id.* (alteration in original) (quoting H.R. Rep. No. 112-10, at 15 (2011)).    Other district courts have similarly focused on removal-defeating strategies, inquiring "whether the plaintiff engaged in intentional conduct to deny the defendant the chance to remove the case to federal court."    *Hiser v. Seay*, No. 5:14–CV–170, 2014 WL 6885433, at *4 (W.D. Ky. Dec. 5, 2014).

The Court agrees that bad faith encompasses such "strategic conduct intended to deny the defendant the opportunity to remove the case to federal court."    The text of Section 1446(c)(1) provides the exception to the one-year rule if the court finds a plaintiff "acted in bad faith *in order to prevent a defendant from removing the action*."    28 U.S.C. § 1446(c)(1) (emphasis added).    Section 1446(c)(3)(B) further explains that bad faith includes a plaintiff "deliberately fail[ing] to disclose the actual amount in controversy to prevent removal[.]"    28 U.S.C. § 1446(c)(3)(B).

Plaintiffs can demonstrate bad faith by joining nondiverse defendants with the intention to prevent defendants from removing the case to federal court.    *Sloss*, 2018 WL 9815609, at *4.    The *Sloss* court did not find such intent when plaintiffs "had colorable claims against the individual defendants[,]" did not "delay to avoid federal

7

jurisdiction[,]" and "offer[ed] a plausible explanation for dismissing the individual defendants." *Id.* Another court found no bad faith in joining a nondiverse defendant when the nondiverse defendant was included in the initial complaint, the complaint had not been changed during the one-year removal window, and plaintiffs actively prosecuted the case, opposed the nondiverse defendant's motion for summary judgment and sought to avoid their dismissal. *Ehrenreich v. Black*, 994 F. Supp. 2d 284, 289 (E.D.N.Y. 2014) (finding no bad faith when "[p]laintiffs do not appear to have taken any actions specifically to defeat removal"). In contrast, plaintiffs acted in bad faith when they delayed accepting a settlement offer until the one-year window passed with the stated intent of retaining nondiverse parties to avoid removal. *Hiser*, 2014 WL 6885433, at *4; *see also Lawson v. Parker Hannifin Corp.*, No. 4:13-cv-923-O, 2014 WL 1158880, at *5-7 (finding bad faith when plaintiffs dismissed the nondiverse defendant three months after the one-year mark, among other delay tactics).[3]

As the parties note (Docs. 21-1, at 17; 23, at 10), other courts in the Eighth Circuit perform a two-step analysis that focuses on whether the plaintiff actively litigated the case against the non-diverse defendant, then allows the defendant to overcome the presumption against remand by showing evidence that plaintiff acted solely for the purpose of preventing removal. *SAAC Invs., LLC v. Secura Ins.*, No. 4:22-CV-01174-NCC, 2023 WL 1070353, at *3 (E.D. Mo. Jan. 27, 2023) (citing *Aguayo v. AMCO Ins. Co.*, 59 F. Supp. 3d 1225, 1274-75 (D.N.M. 2014)) (collecting other Eastern District of Missouri cases). The Court, however, declines to adopt *Aguayo*'s "but-for" requirement for defeating removal. The text of the statute only requires that plaintiffs "acted in bad faith

---

[3] Some district courts have described the bad faith standard in more exacting terms. *Sloss*, 2018 WL 9815609, at *3 (collecting cases). But this standard arose from cases predating the 2011 amendments to the removal statute that added the bad faith exception. *Id.*

in order to prevent a defendant from removing the action." 28 U.S.C. § 1446(c)(1). But this text can extend to mixed motives. The text does not, on its face, require that plaintiffs acted solely for the purpose of preventing removal, and the Court need not put such a gloss on the text. *Sloss*, 2018 WL 9815609, at *4.

### III. ANALYSIS

Because defendants removed this case on the basis of diversity jurisdiction more than one year after plaintiffs sued, the Court must remand this action unless it finds plaintiffs acted in bad faith. 28 U.S.C. §§ 1446(c)(1), (c)(3)(B). Plaintiffs argue they did not engage in bad faith conduct that justifies removal at this stage. (Doc. 21-1, at 12). In plaintiffs' telling, they had colorable claims against the Iowa defendants and did not use delay tactics to dismiss the Iowa defendants only after the removal deadline. (*Id.*).

Defendants resist, asserting bad faith on several grounds. (Doc. 23). Defendants assert plaintiffs named the Iowa defendants in bad faith from the beginning because their claims could not be supported by facts or law.[4] (Doc. 23, at 11-12). Defendants also assert plaintiffs improperly delayed dismissing the claims against the Iowa defendants. (*Id.*, at 13-14). Defendants further argue plaintiffs did not actively litigate against the Iowa defendants and that their asserted reasons to dismiss the Iowa defendants after the removal deadline are lacking. (*Id.*, at 15, 17).

In reply, plaintiffs argue there is no evidence of intentional conduct to prevent removal. (Doc. 26, at 2). They further argue their claims against the Iowa defendants were valid from the beginning, pointing to information provided by Liberty Drainage and

---

[4] Defendants do not appear to assert the judicial doctrine of "fraudulent joinder" as an argument (*See* Doc. 23, at n.1.) but instead only assert that adding the non-diverse parties was "bad faith" under Section 1446. As *Aguayo* explains, the bad-faith exception is distinct from the argument of fraudulent joinder. 59 F. Supp. 3d at 1264. Thus, the Court does not consider the doctrine of fraudulent joinder further.

9

pointing to Iowa law. (*Id.*, at 2-3). Plaintiffs reiterate they did not delay or intentionally employ removal-defeat strategies, that they conducted sufficient discovery, and that they only dismissed the Iowa defendants almost three years after filing the lawsuit. (*Id.*, at 5-8).

For the following reasons, the Court finds plaintiffs did not act in bad faith, and thus grants plaintiffs' motion for remand.

### A.     *The Initial Decision to Sue*

First, plaintiffs had colorable claims against the Iowa defendants. Again, before the suit, Liberty Drainage informed plaintiffs that Harry's Farm Tire installed the tire before the accident and that Sadler Power Train put the brakes on the truck in June before the accident. (Docs. 21-1, at 4; 21-6, at 1). Further, defendants SHG and CMA's answers also raised the Iowa defendants' negligence as an affirmative defense, asserting it "was the real, active and primary cause of the alleged injuries complained of in the Petition. The superseding, initiating, and intervening negligence is pleaded in bar of recovery by the Plaintiffs." (Doc. 1-1, at 162, 597) (asserting CMA's Fifteenth Defense and SHG's Sixteenth Defense).

As for Sadler, the Court rejects defendants' argument that plaintiffs "do not explain what Sadler was supposed to have seen during the alleged inspection that would have caused Sadler to recommend that Liberty Drainage replace the tires." (Doc. 23, at 11-12). Plaintiffs alleged defendant Sadler was liable for negligent inspection of the tire and vehicle because Sadler inspected the subject tire (Doc. 1-1, at 9) and then represented it could be safely used and would be fit for the ordinary purposes for which it was intended. (*Id.*, at 25). Plaintiffs further asserted specific defects in the tire:

> [a]t the time of the inspection . . . the subject tire was defective and unreasonably dangerous in that it had defects in both design and manufacture, in at least the following respects:

10

a. Inadequate bonding within the operative belt tire, which substantially and unreasonably increased the risks and incidence of tread separation;

b. An inner liner that was inadequate and unsafe for the ordinary purposes for which it was intended, which substantially and unreasonably increased the risks and incidence of tread separation; and

c. In other respects currently unknown, but may be developed through the course of discovery.

(Doc. 1-1, at 25-26).

Plaintiffs then alleged Sadler "failed to properly conduct an adequate inspection of the subject tire" and "[a]s a direct cause" of this failure or of the "failure to identify the defects and/or unreasonably dangerous conditions of the subject tire," the tire was used, and the tread on the subject tire separated and caused the subject collision. (Docs. 1-1, at 26, 100; 26, at 4).[5] Without making any findings on the merits or the evidence, the Court finds the details of these allegations supports a finding that plaintiffs did not sue Sadler Power Train to prevent removal.

Turning to Harry's Farm Tire, defendants argue Iowa law makes a seller such as Harry's Farm Tire immune from suit as long as the manufacturer is subject to jurisdiction, so the claims against Harry's Farm Tire could only be made in bad faith. (Doc. 23, at 12) (citing IOWA CODE § 613.18). Plaintiffs also purportedly knew by August 2020 that Harry's Farm Tire did not sell or install the subject tire in 2018, but in 2014, diminishing the viability of their claim against Harry's Farm Tire. (*Id.*, at 11). Plaintiffs also purportedly knew before the suit that their expert would not offer an opinion that either

---

[5] Plaintiffs also argue defendants CMA and SHG claimed that a puncture in the tire caused the tire to blow out, which would have been noticed by a reasonable inspection of the tire. (Doc. 26, at 4). But plaintiffs offer no support for this assertion, so the Court does not consider it further.

11

Sadler Power Train or Harry's Farm Tire were liable.[6] (*Id.*, at 12-13). Thus, defendants argue plaintiffs knew they had no viable claim against Harry's Farm Tire and only sued to prevent removal. (*Id.*). In response, plaintiffs also argue that Harry's itself never pled immunity or raised 613.18 as a defense. (Docs. 26, at 3; 1-1, at 69).

Plaintiffs brought two claims against Harry's Farm Tire. First, plaintiffs alleged a negligence claim out of Harry's Farm Tire's failure to prevent the sale of the subject tire, failure to warn about the potential risks to all vehicles on the road, and failure to warn that the subject tire was inadequate and unsafe for the ordinary purposes for which it was intended. (Doc. 1-1, at 19, 21, 95). Plaintiffs also asserted a strict liability claim against Harry's Farm Tire out of the same conduct. (*Id.*, at 22, 96).

Iowa Code Section 613.18 states, in relevant part:

> 1. A person who is not the assembler, designer, or manufacturer, and who wholesales, retails, distributes, or otherwise sells a product is:
> a. Immune from any suit based upon strict liability in tort or breach of implied warranty of merchantability which arises solely from an alleged defect in the original design or manufacture of the product.
> b. Not liable for damages based upon strict liability in tort or breach of implied warranty of merchantability for the product upon proof that the manufacturer is subject to the jurisdiction of the courts of this state and has not been judicially declared insolvent.

IOWA CODE § 613.18.

The question is whether it was clear to plaintiffs that Subsection 613.18(1)(b) applies to plaintiffs' failure-to-warn claims against Harry's Tires. As written, Subsection 613.18(1)(b) applies solely to tort claims based in strict liability. *Bingham v. Marshall & Huschart Mach. Co.*, 485 N.W.2d 78, 80 (Iowa 1992) (identifying that

---

[6] The expert inspected the tire before the suit, but defendants do not offer evidence that the expert informed plaintiffs beforehand that he would not offer any opinion that Harry's Farm Tire or Sadler Power Train were liable. Thus, the Court does not consider this argument further.

Subsection 613.18(1)(b) applies to "suits under strict liability for failure to warn"). After its passage, however, the Iowa Supreme Court eliminated the distinction between strict liability and negligence in post-sale failure to warn claims. *Lovick v. Wil-Rich*, 588 N.W.2d 688, 695 (Iowa 1999), *as amended on denial of reh'g* (Mar. 25, 1999), *amended on denial of reh'g* (Apr. 12, 1999) (citing *Olson v. Prosoco, Inc.*, 522 N.W.2d 284, 288–90 (Iowa 1994)); *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 169 (Iowa 2002) (eliminating the distinction between strict liability and negligence for design defect claims and instructing that claims should be designated "a design defect claim without reference to strict liability or negligence."). At present, Subsection 613.18(1)(b) has not been amended, and the Iowa Supreme Court has not clarified the state of its immunity. When considering this issue on summary judgment but without relevant briefing, the Court has assumed without deciding that Section 613.18 immunity continues to apply to design defect claims. *See Merfeld v. Dometic Corp.*, 306 F. Supp. 3d 1070, 1077 n.5 (N.D. Iowa 2018); *see also Anderson v. Kmart Corp.*, No. 4:13-cv-00216-RAW, 2014 WL 11514683, at *4 (S.D. Iowa Oct. 20, 2014).

But here, on a motion to remand, defendants bear the burden to prove jurisdiction, and the Court declines to make an assumption of Iowa law in their favor. It is possible that Subsection 613.18(1)(b) immunizes Harry's Farm Tire from liability for post-sale failure to warn claims. Ambiguous statutory immunity, however, is not sufficient for defendants to meet the heavy burden of proving jurisdiction. Defendants would have to show that plaintiffs knew Harry's Farm Tire was immune under the statute and nevertheless sued it with the bad faith motive of defeating diversity of citizenship jurisdiction. This they cannot do when the law is ambiguous. At this stage, it is enough that plaintiffs pled that Harry's Farm Tire "marketed, distributed and sold" the subject tire "and represented that the subject tire could be safely used and would be fit for the ordinary purposes for which it was intended[,]" that it had specific defects, and that

13

Harry's Farm Tire "failed to prevent the sale of the subject tire" and to provide adequate warnings that the subject tire was "inadequate and unsafe for the ordinary purposes for which it was intended." (Doc. 1-1, at 19-21). Based on the facts alleged in the State Petition, Plaintiffs' claim against Harry's Tire Claim for post-sale failure to warn had a reasonable basis in fact or law. Thus, the Court does not find that plaintiffs named Harry's Farm Tire as a defendant specifically to destroy diversity.

### B.      *Passing the Removal Deadline*

The Court finds plaintiffs did not delay the case past the removal deadline on May 1, 2021, to avoid removal to federal court. Though plaintiffs did not dismiss Iowa defendants until after the removal deadline, plaintiffs assert they did not use delay tactics to keep Iowa defendants in the case. (Doc. 21-1, at 12). Plaintiffs argue the delay stems from difficulties with serving SHG under the Hague Service Convention and, thus, focused their discovery efforts on addressing the Iowa court's personal jurisdiction because they believed they could not practically prove the Iowa defendants' liability without proving defendants SHG or CMA's liability. (*Id.*). Defendants assert plaintiffs' lack of discovery against Iowa defendants, failure to depose Iowa defendants' witnesses, and failure to subpoena third parties related to Iowa defendants is evidence of bad faith.[7] (Doc. 23, at 13-15, 16).

The Court turns to plaintiffs' lack of discovery with the Iowa defendants. Plaintiffs argue they focused on resisting defendant SHG's motion to dismiss for lack of personal jurisdiction. (Docs. 21-1, at 14-15; 21-4, at 2). In plaintiffs' telling, absent the ability to prove in court that the subject tire contained design and manufacturing defects, plaintiffs could not prove its claims against the Iowa defendants. (Docs. 21-1,

---

[7] Again, defendants raise these failures as evidence plaintiffs did not actively litigate against the Iowa defendants under the *Aguayo* test. Though the Court does not apply or follow that test, it will consider these failures.

at 14-15; 26, at 6). Defendants resist, asserting plaintiffs still needed to, and failed to, develop different evidence to prove their claims against the Iowa defendants because the Iowa defendants could only be liable for their own actions or inactions. (Doc. 23, at 14).

Although it is true plaintiffs' claims against the Iowa defendants have different elements than those against defendants SHG and CMA, the claims still depend on the evidence of defects in the subject tire. (Docs. 21-1, at 14-15). Plaintiffs' claim against Sadler Power Train relied on Sadler Power Train's "fail[ure] to exercise reasonable care and caution with respect to the tire inspection in failing to identify the manufacturing and design defects . . . ." (Docs. 1-1, at 25; 26, at 4). In addition, plaintiffs' claims against Harry's Farm Tire relied on "the defects and unreasonably dangerous characteristics" of the subject tire. (Docs. 1-1, at 21, 23; 26, at 3). The Court thus finds plaintiffs could plausibly believe "if there was no case against CMA and SHG, there was no case against [the Iowa defendants]." (Doc. 26, at 6).

In light of this dependency, plaintiffs assert they obtained sufficient information relating to the Iowa defendants' liability from the parties' initial disclosures, the deposition testimony of Liberty Drainage's driver, and the documents Liberty Drainage provided in response to defendants' subpoena. (Docs. 21-1, at 17; 26, at 6). As defendants note, plaintiffs did not issue the subpoena against Liberty Drainage. (Doc. 23, at 16). It is also true that at this deposition, plaintiffs' counsel did not rely on the documents from Liberty Drainage's subpoena when questioning Liberty Drainage. (Doc. 21-14, at 9-12, 15-16). But defendants SHG and CMA, pleading that the Iowa defendants' negligence obviated their own, relied on those documents and questioned Liberty Drainage about the Iowa defendants. (*Id.*, at 4-6). Nothing prevented plaintiffs from relying on that questioning for their own strategy. Thus, at this stage, the Court

15

does not find plaintiffs' lack of discovery against the Iowa defendants or third parties to indicate bad faith.

In sum, it is plausible plaintiffs' lack of discovery against the Iowa defendants arose from litigation strategy, instead of reflecting plaintiffs' naming the Iowa defendants to defeat removal. Though the Court will address the contents of the initial disclosures below, it finds plaintiffs' lack of discovery against the Iowa defendants is not evidence of bad faith.

The Court also does not find plaintiffs unduly delayed in the course of the litigation. Plaintiffs served all defendants the day of the suit. (Doc. 1-1, at 1-8). On June 17, 2020, plaintiffs were required to serve defendant SHG under the Hague Service Convention. (Doc. 1-1, at 511). That day, plaintiffs moved, with defendants' approval, to extend the service under the Hague Service Convention for this extension of time. (*Id.*). On November 25, 2020, plaintiffs served SHG through those procedures. (Doc. 21-4, at 2). The Court finds no evidence of intentional delay in plaintiffs' service.

On December 15, 2020, defendant SHG moved to dismiss the case for lack of personal jurisdiction and the court permitted jurisdictional discovery and argument on this issue. (*Id.*). Then, the parties litigated personal jurisdiction (Doc. 1-1, at 512), receiving a ruling on that issue two years later on March 14, 2021. (Doc. 21-4, at 3; 1-1, at 512). Throughout the litigation, the parties filed joint motions to extend discovery deadlines, which the court granted. (Doc. 1-1, at 512, 517, 523, 561, 565, and 633). Even after the removal deadline, these motions cited the delay in service and the litigation over personal jurisdiction. (*Id.*). The parties on both sides thus contributed to scheduling discovery after the removal deadline. (*Id.*, at 516, 565, 633).

The Court, therefore, does not find the delay in discovery past the deadline to be evidence of bad faith. In arguing plaintiffs improperly delayed the suit, defendants repeat their arguments that plaintiffs knew they did not have viable claims and did not

16

perform discovery. (Doc. 23, at 13-15). Because the Court has addressed both of these arguments above, it need not reiterate its analysis here.

### C.    *Dismissing After the Deadline*

The Court turns to plaintiffs' reasoning behind dismissing the Iowa defendants only after the removal deadline. Plaintiffs assert several reasons. (Doc. 21-1, at 15). First, plaintiffs could not develop substantive discovery against defendants until a year after the removal deadline because they had to focus on achieving service under the Hague Service Convention and then had to litigate personal jurisdiction. (Docs. 21-1 at 13; 26, at 7). Second, the evidence developed over litigation weakened plaintiffs' case against the Iowa defendants. (Doc. 21-1, at 13). Third, counsel for plaintiffs wanted to avoid having three sets of defense counsel cross-examine plaintiffs. (*Id.*). Fourth, dismissal was preferable for trial strategy purposes, and the expenditure of time, resources, and expenses. (*Id.*).

Defendants resist, asserting plaintiffs kept the Iowa defendants in the case as long as possible to prevent CMA and SHG from removing the case to the Court. (Doc. 23, at 15). Defendants repeat their arguments that plaintiffs knew their claims were weak from the beginning. (*Id.*). Defendants further assert plaintiffs only dismissed their claims in response to motions for summary judgment, rather than for strategic concerns. (*Id.*, at 17-18).

Plaintiffs' argument that jurisdictional discovery and service issues delayed their ability to engage in substantive discovery to after the removal deadline is plausible. (Doc. 21-1, at 16). Again, the Court has found plaintiffs did not intentionally delay the case past the removal deadline, thus it is plausible they could not make decisions based on substantive discovery until after the removal deadline.

Plaintiffs' argument that evidence weakened their claims after the removal deadline is less compelling, however, because their claims were already weak before that

point in the litigation. Before the removal deadline, plaintiffs obtained initial disclosures that weakened Iowa defendants' connection to the condition of the subject tire. (Docs. 21-1, at 14; 23, at 14). Harry's Farm Tire's initial disclosure and the attached invoice revealed it had sold the tire to Liberty Drainage in October 2014, almost four years before the crash, which decreased the viability of the failure-to-warn claims against Harry's Farm Tire. (Docs. 21-1, at 14; 21-9, at 3; 21-11, at 1). Additionally, Sadler Power Train's initial disclosure and the attached invoice revealed it was employed only to fix the brakes, not the tires, in June 2018. (Docs. 21-1, at 14; 21-8, at 2; 21-12, at 1). On or about the removal deadline, specifically prior to May 25, 2021, plaintiffs learned defendant SHG sold the tire to K&M Tire in Iowa, who then sold that tire to Harry's Farm Tire, further decreasing the viability of their claims. (Docs. 21-1, at 6, 14; 21-13, at 1) (Item No. 1133378258).

The case, already weak, became weaker months after the removal deadline. (Docs. 21-1, at 7; 21-14). Testimony from Liberty Drainage revealed that it, not Sadler Power Train, employed the inspector who prepared the annual inspection the year of the accident. (Docs. 21-1, at 7; 21-14, at 4). Testimony also confirmed that Harry's Farm Tire installed the tire four years prior, rather than a year earlier. (Docs. 21-1, at 7; 21-14, at 6, 13). And more than a year after the removal deadline, expert testimony did not strengthen the claims against the Iowa defendants. On November 21, 2022, after deposing defendants SHG and CMA's witnesses, plaintiffs served expert designations with reports that did not support Sadler Power Train and Harry Farm Tire's liability. (Doc. 21-1, at 8; 21-4, at 4). When the Iowa defendants indicated they would file dispositive motions, plaintiffs asked for time to review defendants SHG and CMA's expert reports, and then appear to have taken that time. (Docs. 21-15, at 1; 1-1, at 798, 806-08). Only then did they dismiss the claims against the Iowa defendants. (Doc. 1-1, at 798, 806-10).

In hindsight, nothing prevented plaintiffs from dismissing the Iowa defendants before the removal deadline or shortly after the removal deadline. Plaintiffs themselves assert the case was weakened at the time of the initial disclosures. (Doc. 21-1, at 14). Again, however, defendants SHG and CMA pled that the Iowa defendants' negligence barred their own (Doc. 1-1, at 162, 597), and questioned Liberty Drainage about the Iowa defendants. (Docs. 21-14, at 4,6). Given their adversarial behavior toward the Iowa defendants, it is a close call whether plaintiffs could plausibly hope defendants CMA and SHG's expert reports would strengthen the negligence claims against the Iowa defendants. Given that "[a]ll doubts about federal jurisdiction be resolved in favor of remand[,]" the Court finds this weakness of evidence is not evidence of bad faith. *Sloss*, 2018 WL 9815609, at *2.

Plaintiffs also assert they wanted to avoid having three different attorneys cross-examining plaintiffs at trial and wanted to narrow the issues at trial. (Doc. 21-1, at 18). To this, defendants argue again that plaintiffs knew from early on that they did not have viable claims against the Iowa defendants and that plaintiffs only dismissed in response to motions for summary judgment. (Doc. 23, at 17-18). The Court has already addressed both these arguments and need not reiterate its analysis.

Defendants also argue plaintiffs' dismissal of the claims in response to a motion is evidence of bad faith. (Doc. 23, at 17). In response, on January 9, 2023, Sadler Power Train moved for summary judgment on the grounds of lack of expert testimony. (Doc. 1-1, at 749-58). Even so, plaintiffs did not dismiss the claims immediately. Instead, they asked for an extension of time to respond to the motion so they could "see CMA/Double Coin's expert reports first." (Docs. 21-4, at 4; 21-15, at 1)).[8] When the Iowa defendants indicated they would file dispositive motions, plaintiffs asked for time

---

[8] Plaintiffs also argue they wanted to test if additional discovery was needed, but this is not supported by the cited record. (Docs. 21-4, at 4; 21-15, at 1).

to review other expert reports, and then appear to have taken that time. (Docs. 21-15, at 1; 1-1, at 798, 806-808). Two weeks after defendants SHG and CMA provided their expert disclosures, plaintiffs dismissed their claims against Sadler Power Train. (Doc. 1-1, at 798, 805-808). A week later, plaintiffs dismissed their claims against Harry's Farm Tire without prejudice. (*Id.*, at 808-10).

The Court rejects defendants' argument that plaintiffs could not "suddenly uncover" new facts in January 2023 that they did not already know from their expert's initial inspection and the initial disclosures (Doc. 23, at 18); given that defendants SHG and CMA pled that the Iowa defendants' negligence barred their own and that defendants questioned Liberty Drainage about the Iowa defendants, plaintiffs could plausibly wait to see if defendants' experts spoke on the Iowa defendants' liability. To the extent defendants assert that plaintiffs acting in good faith would have served even minimal discovery requests (Doc. 23, at 18), the Court has already addressed plaintiffs' discovery behavior and need not reiterate its analysis.

Defendants also argue plaintiffs' failure to dismiss claims other than those against the Iowa defendants indicates bad faith. (Doc. 23, at 18) (distinguishing from *Sloss*, 2018 WL 9815609, at *4). The Court disagrees, because dismissing the claims against the Iowa defendants eliminated plaintiffs' need to prove Harry's Farm Tire's knowledge of the subject tire and Sadler Power Train's inspection, permitting them to focus on defendants' conduct. (Doc. 1-1, at 19-27).

The Court also finds the timing of dismissal supports the plausibility of plaintiffs' explanations. Long after the removal deadline, plaintiffs dismissed Sadler Power Train and Harry's Farm Tire at different times. (Doc. 1-1, at 805-10). At this stage, when all doubts must be resolved in favor of remand, the different dates support a finding that plaintiffs dismissed the Iowa defendants for different reasons and not on the basis of their citizenship. *See Sloss*, 2018 WL 9815609, at *2. Moreover, plaintiffs did not dismiss

soon after the removal deadline, but years later, which supports an inference that they dismissed due to discovering the weakness of the case and not solely because the removal deadline had passed. *Id.* at *4 (finding no bad faith when plaintiffs dismissed the nondiverse defendant eight months after the one-year mark); *Lawson*, 2014 WL 1158880, at *1, 5-7 (finding bad faith when plaintiffs dismissed the nondiverse defendant three months after the removal deadline, among other delay tactics). Plaintiffs also dismissed the Iowa defendants four months before trial (Doc. 1-1, at 627), supporting an inference the concerns about trial presentation, not jurisdiction, motivated the dismissal.

## IV.   CONCLUSION

In sum, the Court finds plaintiffs did not act in bad faith under Section 1446. For that reason, defendants improperly removed this action to federal court more than a year after the filing date. Thus, the Court **grants** plaintiffs' motion to remand. (Doc. 21). The Court orders this case **remanded** to the Iowa District Court for Cedar County.

**IT IS SO ORDERED** this 16th day of May, 2023.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

Case 1:23-cv-00015-CJW-KEM   Document 27   Filed 05/16/23   Page 21 of 21